

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN PIERIK, | ) | |
| | ) | |
| Plaintiff, | ) | No. 05 C 6750 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of Social Security, | ) | Magistrate Judge Maria Valdez |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This is an action brought under 42 U.S.C. § 405(g) to review the final decision of

the Commissioner of Social Security denying plaintiff John Pierik's claim for

Supplemental Security Income.  The parties have consented to the jurisdiction of the

United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons explained

below, Pierik's Motion for Summary Judgment or Remand [Doc. No. 24] is granted in

part and denied in part; and the Commissioner's Motion for Summary Judgment [Doc.

No. 31] is denied.  The Court hereby vacates the ruling of the Administrative Law Judge

and finds that this matter should be remanded for further proceedings.

## I.    PROCEDURAL HISTORY

Pierik originally applied for Title II Disability Insurance Benefits ("DIB") on

December 15, 2003, alleging a disability onset date of September 6, 2003 due to reactive

---

[1] Michael J. Astrue is substituted for his predecessor pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure.

airway disease, severe dry eye syndrome, chronic fatigue, leg cramps, chronic rash, cold hands, voice problems, weight loss, and nose bleeds. (R. 37.) The application was denied initially on March 9, 2004 and upon reconsideration on September 17, 2004 on the grounds that he failed to qualify for benefits because he still had the ability to do light work that did not involve concentrated exposure to respiratory irritants. (R. 33-37, 42-45.) Pierik filed a timely request for a hearing on September 27, 2004, and the hearing was held on April 28, 2005 before administrative law judge ("ALJ") Paul Armstrong. (R. 46, 267.) Pierik appeared and testified in person at the hearing and was represented by David Bryant, as counsel. (R. 267.) William Schweihs testified as the vocational expert, Ernest Mond testified as the medical expert, and Pearl Pierik, the claimant's wife, also testified. In a decision dated June 24, 2005, the ALJ found Pierik not disabled within the meaning of the Social Security Act and denied his application for benefits, finding that Pierik has the residual functional capacity to perform the full range of light work. (R. 21-30.) The Social Security Administration ("SSA") Appeals Council denied Pierik's request for review on September 30, 2005, (R. 4), leaving the ALJ's decision as the final decision of the Commissioner and therefore reviewable by the District Court under 42 U.S.C. § 405(g).

## II.  FACTUAL BACKGROUND

### A.  Background

Pierik was born on May 21, 1953; at the time of the hearing, he was fifty-one years old. (R. 28.) He is married with no minor children. (R. 79.) He has a college education with work experience as an emergency room nursing assistant for four years, a

registered emergency room nurse for three years, and a registered operating room nurse for seven years. (R. 96, 91.) On February 11, 2002, bone cement splashed in his eyes while he was assisting with a hip replacement and orthopedic procedure. (R. 146, 155.) After irrigating his eyes, Pierik went to the emergency room, where it was determined he did not have corneal abrasions. (R. 155.) He was sent home with instructions to stay off work for the rest of the day and to follow up with the employee health service. (R. 146.)

On March 4, 2002, Pierik was seen by Dr. Robert A. Balk, a pulmonary specialist, who informed him that he could return to work when he felt well enough to do so. (R. 251.) In April 2002, Pierik went back to work on light duty which required extensive "eye work", including working with reports and computers all day. (R. 99, 102, 107.) On September 6, 2003, Picrik was terminated by his employer. (R. 90.) He claims disability beginning on September 6, 2003. (R. 227.)

## B.    Medical Evidence and Testimony

### 1.    *Medical Evidence*

Since the chemical injury, Pierik has been treated by his primary physician, Dr. Michael Lynch, at least twenty-eight times. (R. 234-47.) Pierik has also been treated by Dr. Balk; Dr. Stephen D. Rheinstrom, an eye specialist; Dr. Pradeep Keni and Dr. Robert W. Bastian, voice specialists; and Dr. Mark Hoffman, a dermatologist. (R. 228-29.) Pierik was also evaluated by a non-treating, non-examining, disability determination services ("DDS") medical consultant. (R. 199-206.)

### a.    Dr. Lynch

Dr. Lynch has treated Pierik since 1985. (R. 210.) An examination with Dr. Lynch on February 25, 2002, after the chemical injury, revealed that Pierik suffered from

3

tight chest and lack of energy, a decrease in his strength of voice, shortness of breath, bloody nose, visual changes, and a mild rash. (R. 246.) A follow up examination with Dr. Lynch on March 21, 2002 revealed that Pierik could not focus, continued to lose weight, frequently became cold, suffered shortness of breath, and was only able to do ten minutes on a treadmill, although he was able to do fifty minutes before the injury. (R. 245.) On December 5, 2003, Dr. Lynch opined that Pierik could no longer work as an operating room nurse due to permanent eye damage and reactive airway disease. (R. 190.)

On February 8, 2004, Dr. Lynch completed a questionnaire diagnosing Pierik with dry eye syndrome, reactive airway disease and dermatitus secondary to methyl methacrylate exposure and concluded that Pierik was unable to do any heavy type of work because it caused an increase in his bronchospasms, but Pierik had no difficulty with sitting or with light duty. (R. 194-98.)

On June 7, 2004, Dr. Lynch completed a Physical Residual Functional Capacity Assessment ("RFC") of Pierik, again diagnosing dry eye syndrome and reactive airway disease and noting that Pierik's impairments could be expected to last at least twelve months. (R. 210.) Dr. Lynch opined that Pierik will frequently experience pain or other symptoms severe enough to interfere with attention and concentration; that he is capable of a low stress job; that he can sit and stand for more than two hours and for at least six hours in an eight hour work day; that he will need to take unscheduled breaks hourly to administer eye drops and rest for minutes before returning to work; that he can occasionally lift twenty pounds and rarely lift fifty pounds; that he can occasionally climb ladders and rarely climb stairs; and that his impairments are likely to produce "good

4

days" and "bad days" where he will likely be absent more than four days per month due to these impairments. (R. 210-13.)

In a May 27, 2005 letter to the ALJ, Dr. Lynch stated that since 2002, Pierik has suffered from dry eye syndrome, reactive airway disease and severe fatigue due to his exposure to bone cement. (R. 264.) Dr. Lynch asserted that as a result of the exposure, Pierik has broncohospasms and asthma as well as dry eye syndrome requiring Pierik to put artificial tears in his eyes. (Id.) Dr. Lynch listed the following prescribed medications: Tetracycline, Prednisone, Zyrtec, Combivent, Bacitracin, and Cortizone cream. (Id.) Furthermore, Dr. Lynch stated that Pierik's ailments and treatments will frequently interfere with his ability to pay attention and concentrate on even simple tasks at any job; that he cannot tolerate a stressful work environment; and that he should not lift or carry anything heavier than ten pounds on a regular basis. (Id.) Finally, Dr. Lynch asserted that Pierik's fatigue levels, which are a direct result of his exposure to bone cement, would preclude any meaningful full-time employment and that Pierik's "good days" and "bad days" would result in his absence from any work for more than four days a month. (Id.)

### b.    Dr. Balk

On March 4, 2002, Dr. Balk, a pulmonary specialist, diagnosed Pierik with Dyspenea when a Pulmonary Function Test revealed a mild obstructive airway defect. (R. 250-51.) He prescribed an inhaler and told Pierik he could return to work when he was feeling well enough to do so. (R. 251.) On June 27, 2002, Dr. Balk noted that Pierik's pulmonary function findings were improved over earlier tests. (R. 252.) Dr. Balk concluded that Pierik's reactive airway disorder was stable on Advair. (Id.) On

5

September 2002, pulmonary function tests again showed mildly decreased FEV1 (forced expiratory volume in one second), which was greater than 74.3% of the predicted rate. (R. 254.) In a Respiratory Report on February 6, 2004, Dr. Balk diagnosed Pierik with Chronic Obstructive Pulmonary Disease (COPD). (R. 191.)

### c.   Dr. Rheinstrom

On April 11, 2002, Dr. Rheinstrom, an eye specialist, diagnosed Pierik with dry eye syndrome secondary to chemical injury and prescribed the medication Genteal as a lubricant for his eyes. The doctor noted that Pierik reported an 80% improvement of eye symptoms with the medication. (R. 162.) On March 3, 2003, Dr. Rheinstrom concluded that Pierik's dry eye syndrome had not worsened, but it was unlikely to improve, and Pierik would need to continue to frequently use artificial tears. (R. 166.)

### d.   Dr. Keni and Dr. Bastian

On May 20, 2002, Pierik began seeing Dr. Keni for voice problems. (R. 184-85.) Dr. Keni noted vocal cord atrophy bilaterally and a small glottic gap of two millimeters. (R. 248.) He recommended no treatment but opined that Pierik might need voice therapy in the future. (*Id.*) On December 11, 2002, Dr. Keni referred Pierik to Dr. Bastian, an otolaryngologist, who diagnosed Pierik with a functional posturing disorder and noted that Pierik could gain his voice back through speech therapy. (R. 188.)

### e.   Dr. Hoffman

On April 1, 2004, Dr. Hoffman, a dermatologist, examined Pierik and diagnosed him with Grover's disease, a skin condition, based on a punch biopsy. (R. 221-23.) He prescribed an ointment, which gave some relief within two weeks. (R. 221.) On May 13,

6

2004 and on July 15, 2004, Dr. Hoffman noted that the Grover's disease was improved. (R. 215-16.)

### f.    **DDS Medical Consultant**

On February 27, 2004, an RFC evaluation was completed by a non-treating, non-examining DDS medical consultant, who stated that Pierik could occasionally lift and/or carry twenty pounds, that he could frequently lift and carry ten pounds, that he could stand and/or walk about six hours in an eight hour work day, that he could sit about six hours in an eight hour work day, and that no postural, manipulative, visual, communicative, or environmental limitations were established with the exception of avoiding concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (R. 199-206.)

### 2.    *Pierik's Testimony*

At the ALJ hearing, Pierik testified that he was injured when a vial collapsed during surgery and sprayed hazardous chemicals in his eyes, nose and throat. (R. 269-70.) After the accident, Pierik could not talk and underwent therapy until his voice improved. (R. 270.) Since the accident, Pierik reported that he suffered from "dry eye" and that it was a "persistent problem" which required him to use artificial tears. He reported that his eyes dried out faster when he had to keep them open and focused on a computer screen. (R. 273-75.) When working at a computer, he used eye drops every fifteen minutes and then needed to close his eyes for fifteen minutes to an hour to prevent a severe headache. (*Id.*) Pierik noted that he had been treated for skin rashes and still had rashes on his trunk. (R. 271.)

Pierik testified that he had never experienced cramps prior to his exposure to the chemical, but since his accident he could not walk six hours of an eight hour day five days a week due to fatigue and leg cramping. (R. 297, 269.) Pierik testified that he tried to go to the gym but that he had "bad days" more than four times a month where he could not go to the gym. (R. 300.) At the gym, Pierik walked on the treadmill for twenty to thirty minutes. (*Id.*)

Pierik stated that he had seen a vocational counselor but was not able to obtain a permanent job. (R. 291-92.) Pierik testified that he must nap every day due to fatigue and headaches. (R. 303.) Pierik further testified that he performed a light duty job as a nurse doing filing jobs after the accident, but he was terminated because he could not perform the duties, and he risked an allergic reaction. (R. 313-15.) While on light duty, Pierik had vision and fatigue problems even though he only worked four hours a day. (R. 314.) Pierik testified that he could not complete his filing duties because "ones look like sevens and P's look like B's." (*Id.*) Due to these problems, Pierik had to rely on other co-workers to assist him in performing his job duties. (R. 314-16.)

### 3. *Pearl Pierik's Testimony*

Pierik's wife testified that Pierik could not perform the chores he performed before the accident because he experienced great fatigue and needed to take frequent naps. (R. 279.) She also testified that Pierik had cramps in his legs and arms and a rash that he used hydrocortisone cream to soothe. (R. 280.) She testified that he used Advair and Combivent when he had trouble breathing and that she needed to drive because he could not drive while using eye drops. (*Id.*) She also testified that he had trouble reading music on the screen at church and that he used his eye drops a minimum of three times an

8

hour when awake. (*Id.*) She stated that Pierik needed to sleep for an hour before going to the gym to build his energy. (R. 281.)

Pierik's wife testified that Pierik could not do a security job where he needed to check gates, make reports, and check-in people because he suffered from serious fatigue and cramps. (R. 281.) She testified that fatigue was a serious problem that he never suffered from before the accident. (R. 280-82.) She stated that he had good days and bad days, and that on bad days (about five or six times a month) Pierik "gets ashen looking and he's tired and he can't do anything." (R. 282.)

### 4.    *Medical Expert's Testimony*

Dr. Ernest Mond, who testified as a medical expert ("ME"), noted that Pierik had a chemical injury to both eyes which was a persistent problem that will not be cured and will require frequent use of artificial tears. (R. 272-73.) The ME also noted that Dr. Lynch, an osteopath, stated that Pierik needed to use artificial tears every two hours. (R. 275.) Furthermore, the ME noted that Pierik was diagnosed with a respiratory reactive airway disease caused by the chemical injury. (R. 276.) The ME testified that Pierik's airflow obstruction was stable on his current medication and that three pulmonary function studies showed some improvement, although the results were not normal. (R. 277.) The ME noted a problem with Pierik's voice, for which Dr. Lynch sent Pierik to an ear, nose and throat specialist who found a gap of approximately two millimeters between his vocal cords, which became normal with expert treatment. (R. 277-78.) Finally, the ME noted that Pierik suffered from Grover's disease, stating that he had never heard of it before, but he "looked it up on the computer," which indicated ("if I read it correctly")

that it was a relatively benign disease causing a common skin rash, which was "an irritating, annoying problem" but not a serious problem. (R. 278.)

The ME testified that Pierik's impairments did not meet a listing. (R. 286.) The ME opined that Pierik had the residual functional capacity to do medium work; that he could stand, walk, and sit without limitations; that he should never use ladders, ropes, and scaffolds; that he should avoid all exposure to extreme cold, humidity, and pulmonary irritants. (*Id.*) The ME noted that Pierik was limited by frequently having to install eye drops and that he could not do his previous work as a charge nurse. (*Id.*) The ME stated that descriptions of Pierik's limitations by Pierik and his wife were consistent with the medical record. (R. 294.)

### 5. *Vocational Expert's Testimony*

The ALJ asked vocational expert ("VE") Schweihs to identify jobs which could be done by a hypothetical person who could perform light work with no exposure to noxious fumes, odors, respiratory, irritants, or extremes of temperature and humidity, no climbing of ropes, ladders, or scaffolds, no work at unprotected heights, around dangerous moving machinery, or open flames. (R. 286.) The VE testified that the individual could not do Pierik's past job but could perform light work as a gate guard, information clerk, some receptionist work, and lobby attendant. (R. 287.) The VE testified that there are approximately 5,000 gate guard and lobby attendants in the Chicago metropolitan area and several thousand receptionists in the Chicago metropolitan area. (R. 288.) The VE testified that Pierik had acquired transferable skills that would relate to receptionist or information clerk positions, of which there were 2,000 jobs in the Chicago metropolitan area. (R. 290.)

The VE testified that if the hypothetical person would be off-task for fifteen minutes to an hour after putting drops in his eyes, he could not do the jobs identified. (R. 288-89.) The VE further testified that an individual who had "good days and bad days" and must miss more than one day a week will not be able to perform any of the identified jobs. (R. 302.) Finally, the VE testified that an individual with the same limitations, who did not have good and bad days but did have interference with concentration, side effects of medication, fatigue so that he would have to nap a couple of times for an hour at a time during the work day, would also not be able to perform any jobs previously mentioned. (R. 316.)

## C.  **ALJ Decision**

The ALJ described Pierik's impairments as severe within the meaning of the Regulations but not severe enough to meet or medically equal a listing. (R. 26.) The ALJ also found that Pierik's allegations of a total inability to work due to his impairments could not be fully credited because medical records "suggested improvement" and Pierik was not limited "to the extreme where he is unable to dress independently, take care of his personal hygiene, carry bags of groceries or baskets of laundry or turn pages of a newspaper book or sorting and filing papers." *Id.* Furthermore, the ALJ found that although treating physician Dr. Lynch's RFC assessment could be construed as precluding any gainful work, the ALJ could not give Dr. Lynch's assessment controlling weight because it was directly contradicted by Dr. Lynch's earlier opinion that Pierik should be able to do light work. (R. 27.) Therefore, the ALJ found that Pierik retains the following RFC: light work, no exposure to noxious fumes, odors or respiratory irritants or extremes of temperature or humidity, no work at unprotected heights, around

11

dangerous moving machinery or open flames and bodies of water, may need to put eye drops in occasionally throughout the day which should take no more than ten to thirty seconds at a time. (R. 29.)

Based on this RFC and the VE's testimony, the ALJ found that Pierik was not capable of performing his past relevant work but was capable of performing semi-skilled work as a receptionist/information clerk or customer service position (2,000 jobs), unskilled gate guard or lobby attendant position (5,000 jobs), and a receptionist position (2,000 jobs). (R. 28.) The ALJ found that Pierik could perform the demands of a full range of light work, and therefore that he was not under a disability as defined in the Social Security Act, at any time through the date of this decision on June 24, 2005. 20 CFR § 404.1520(g); (R. 28-29.)

## III. DISCUSSION

### A.    The ALJ's Legal Standard

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the

claimant unable to perform his former occupation? (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(i)-(v).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## B.    Judicial Review

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). This court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152, F.3d 636, 638 (7th Cir. 1998).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In

cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, the ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## C.   **Analysis**

Although the ALJ found Pierik unable to return to his past work, he did find Pierik able to perform at least light work, which precluded Pierik from being found disabled. (R. 27-29.) The ALJ stated that he believed that the opinions of his treating physician, Dr. Lynch, could not be given controlling weight because they contradicted each other and that Pierik's statements regarding his impairments were not fully credible. (*Id.*) Accordingly, the ALJ found that Pierik had not been under a disability as defined by the Social Security Act at any time through the date of the decision. (R. 29.)

Pierik argues that the ALJ did not properly evaluate the medical source opinions in the record, including an opinion of his treating physician, Dr. Lynch, and did not properly assess Pierik's credibility. (R. 10, 14.) Pierik also maintains that the ALJ improperly based his opinion of Pierik's RFC on the ME's testimony, which conflicted with the medical evidence in the record. (R. 16.)

14

## 1. *ALJ's Disregard of Favorable Evidence*

Pierik first argues that the ALJ ignored evidence that would have been favorable to his disability claim. The ALJ's decision must be based on all relevant evidence in the record. *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000). The Seventh Circuit has frequently ruled that while the ALJ is not required to rule on every piece of evidence, he or she may not select evidence which favors his or her conclusions without articulating reasons for accepting or rejecting "entire lines of evidence." *Herron*, 19 F.3d at 333; *see Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).

An ALJ should give controlling weight to the opinion of a claimant's treating physician regarding the nature and severity of a medical condition if the opinion is well supported by other medical findings and is not inconsistent with other substantial evidence in the record. 20 C.F.R. 416.927(d)(2); SSR 96-2p; *see Clifford*, 227 F.3d at 870. Additionally, the opinion of the non-examining, non-treating physician does not deserve as much weight as those of the examining or treating physicians because a non-treating physician is less familiar with the other information in the case record. 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *Clifford*, 227 F.2d at 870; *see also Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir. 1982) (holding that the ALJ erred in not giving substantial weight to the treating physician's conclusions where there was little contrary evidence).

### a. Dr. Lynch's Opinions

The ALJ stated that he did not give controlling weight to the opinions of Dr. Lynch, Pierik's treating physician, because he found Dr. Lynch's prior testimony contradictory. The ALJ acknowledged that Dr. Lynch's opinion could be construed as

precluding all gainful employment, but he noted that such limitations were inconsistent with Dr. Lynch's previous opinion in February 2004. (R. 193-99.) In February 2004, Dr. Lynch opined in a Respiratory Report that Pierik had no problems with sitting or performing "light duty," although he could not do heavy work because it would increase his bronchospasms. (R. 195.) However, Dr. Lynch's use of the term "light duty" is not the same as the term "light work" as used by SSA: "From time-to-time, medical sources may provide opinions that an individual is limited to 'sedentary work,' 'sedentary activity,' 'light work,' or similar statements that appear to use the terms set out in our regulations and Rulings to describe exertional levels of maximum sustained work capability. Adjudicators must not assume that a medical source using such terms as 'sedentary' and 'light' is aware of our definitions of these terms." SSR 96-5p. Dr. Lynch's use of the term "light duty" in his report cannot be legally determinative of Pierik's actual RFC unless the record also contains objective evidence of those exertional and non-exertional abilities.

Dr. Lynch's later reports further explain Pierik's limitations including frequent interferences with his attention and concentration, an inability to perform more than low stress work, a need for hourly breaks to use eye drops, limitations in using stairs and ladders, shortness of breath, and a likelihood of missing four or more days of work a month. (R. 210-13.) Moreover, Dr. Lynch submitted a post-hearing letter dated May 27, 2005, stating that Pierik's fatigue levels, which are a direct result of his exposure to the bone cement, would preclude any meaningful full-time employment; and that Pierik's "good days" and "bad days" would result in his absence from any work on more than four days a month. (R. 264.)

16

While internal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion, *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence" in the record), the ALJ here did not fully articulate his reasoning for disregarding all of Dr. Lynch's opinions. *See Clifford*, 227 F.3d at 870; *Diaz*, 55 F.3d at 307. Dr. Lynch has been treating Pierik since 1985 and has seen Pierik at least twenty-eight times since the injury. (R. 210, 234-47.) The ALJ did not sufficiently explain why Dr. Lynch's one statement in a Respiratory Report that Pierik could perform "light duty" specifically with regards to brochospasms would render all of his opinions inconsistent or why he did not give any of Dr. Lynch's other opinions controlling weight. Moreover, the ALJ did not point to evidence in the record contradicting Dr. Lynch's opinions regarding Pierik's limitations. In light of these errors, the ALJ should reevaluate whether Dr. Lynch's opinions are entitled to controlling weight. *See Clifford*, 227 F.3d at 871.

### b. VE's Testimony

The ALJ appears to have relied on the VE's assessment based on a single hypothetical that did not include the full range of symptoms addressed in the medical evidence or Pierik's testimony. The ALJ did not fully consider the VE's responses to other hypotheticals which were based on a larger range of Pierik's symptoms. The Seventh Circuit has consistently held that to the extent the ALJ relies on testimony from a VE, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers; otherwise, the vocational testimony will not reveal whether there are jobs in the national economy that a person like the claimant could perform, and if so, how

many. *See Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004); *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).

The ALJ posed four hypothetical questions to the VE. (R. 286-89, 302, 316.) The first hypothetical involved an individual who could perform light work with no exposure to noxious fumes, odors, respiratory, irritants, or extremes of temperature and humidity, no climbing of ropes, ladders, or scaffolds, no work at unprotected heights, around dangerous moving machinery or open flames. (R. 286.) The second hypothetical suggested an individual who would be off-task for fifteen minutes to an hour after putting drops in his eyes, (R. 288-89); the third hypothetical described an individual who has "good days and bad days" and must miss more than one work day a week, (R. 302); and the fourth hypothetical involved an individual who does not have good and bad days but does have interference with concentration, side effects of medication, fatigue so that he would have to nap a couple of times during the work day for an hour at a time, (R. 316).

The VE found the first hypothetical individual was not disabled and could perform a range of jobs. (R. 287-88.) The ALJ appears to give controlling weight to the VE's response to this hypothetical, which did not include many of Pierik's symptoms described in the medical testimony, such as dry eyes, side effects from medication, interference with concentration, fatigue, headaches and leg cramping. In his report, the ALJ did not address the VE's responses to the other three hypothetical questions, all of which concluded that the hypothetical individual was disabled and could not perform the jobs previously identified.

Evidence in the record indicates that Pierik had symptoms described in the second, third, and fourth hypotheticals. Additionally, the ALJ appears to have

improperly substituted his opinion for that of a physician when interpreting particular medical evidence. An ALJ may not "play doctor" by substituting his opinion for that of a physician without relying on other medical evidence or authority in the records. *See Clifford*, 227 F.3d at 870; *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996); *see also Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("The cases in which we have reversed because an ALJ impermissibly 'played doctor' are ones in which the ALJ failed to address relevant evidence.").

Regarding to the second hypothetical, the ALJ's assumption that Pierik's application of eye drops "should take no more than 10-30 seconds" is not found in the record and is directly refuted by Dr. Lynch's opinion and Pierik's testimony. Dr. Lynch noted that Pierik needs to apply eye drops hourly and needs to rest for minutes before returning to work, (R. 212); Pierik testified that he uses eye drops every fifteen minutes and then needs to close his eyes for fifteen minutes to an hour to prevent a severe headache, (R. 274); the ME further noted that Pierik is limited by frequently having to install eye drops and that Pierik's description of his limitations is consistent with the medical record. (R. 286, 294.)

As for the third hypothetical, the ALJ acknowledged Dr. Lynch's conclusion that Pierik has good and bad days which would result in absences more than four days a month but stated, "here's the problem, you know, that I have when doctors, treating doctors tell me that the person would miss more than four days a month. They don't follow the guy around for, to see what he's working, I mean, they just, their guess is as good as anybody." (R. 311.) The ALJ later stated that "when they say something like

19

he's going to miss four days a month, it looks like it's just something out of the blue." (R. 312.) Again, the ALJ appears to have substituted his own opinion for medical testimony. The medical opinion of Dr. Lynch regarding good and bad days was also supported by the testimony of Pierik as well as the testimony of the ME who stated that that Pierik's testimony was consistent with the medical record. (R. 264, 300, 294). Finally, the ALJ did not address the VE's response to the fourth hypothetical, which could support a finding of disability.

### c. DDS Medical Consultant and ME opinions

The ALJ appears to give controlling weight to non-treating physicians, including the ME and the DDS medical consultant. (R. 27.) The ALJ, however, does not address his rationale for giving controlling weight to the DDS medical consultant's report, which did not take into consideration Pierik's chronic and severe fatigue, need for unscheduled breaks, blurry vision, cramps, or voice problems, and did not include evidence which was submitted after the report was completed. Likewise, the ALJ does not explain why he gave the ME's testimony controlling weight over the evidence in the record that could support a disability finding, *i.e.*, Dr. Lynch's opinion, Pierik's testimony, and the VE's testimony. While an ALJ is not required to address every piece of evidence or testimony in the record, the ALJ's analysis must provide some glimpse into the reasoning behind his decision to deny benefits. *See Zurawski*, 245 F.3d at 888. In this case, this court is unable to conduct an informed review of whether the ALJ considered the record as a whole. *See id.*

## 2. *Credibility of Pierik's Testimony*

Pierik next challenges the ALJ's ruling that his testimony lacked credibility.
Generally, an ALJ's credibility determination is granted substantial deference by a
reviewing court. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). In particular, when
a credibility determination is based on subjective evidence, such as the ALJ's observation
of the claimant in the courtroom, the ALJ's opinion will be affirmed on appeal unless the
claimant can demonstrate that he or she was "patently wrong." *Herr v. Sullivan*, 912
F.2d 178, 182 (7th Cir. 1990). An ALJ's assessment will be more closely scrutinized,
however, when objective evidence has influenced the determination. *Anderson v. City of
Bessemer City, N.C.*, 470 U.S. 564, 575 (1985); *see Thomas v. Sullivan*, 801 F. Supp. 65,
70 (N.D. Ill. 1992) (explaining that when "objective inconsistency" is at issue, "the ALJ
has no special advantage over a reviewing court in determining credibility"). In this case,
the ALJ evaluated Pierik's credibility in light of objective medical evidence in the record,
and therefore this Court need not give the ALJ's determination substantial deference.

Although the ALJ stated several times during the hearing that he believed Pierik
to be credible ("you're credible people," (R. 296), "you're a very credible person," (R.
324)), the ALJ ultimately found Pierik's testimony lacked credibility because Pierik's
claimed impairments were not extreme, and the medical record suggested improvement
of his impairments.[2] (R. 26-27).

---

[2] The ALJ's decision also briefly noted that Pierik collected worker's compensation
benefits. (R. 26.) The Commissioner maintains this was essentially a declaration that
Pierik was able to work, which undermined his credibility. However, nothing in the
record suggests that Pierik declared he was able to work in relation to his worker's
compensation claim. Moreover, when read in context, the ALJ's discussion of worker's
compensation appears to suggest that the receipt of those benefits demonstrates that

First, the ALJ asserted that Pierik's "dry eyes [do] not appear to limit him to the extreme where he can dress independently, take care of his personal hygiene, carry bags of groceries or baskets of laundry or turn pages in a newspaper, book or sorting and filing papers." (R. 26.) However, a claimant's ability to do chores is not necessarily indicative of the ability to work, because his daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms. SSR 96-7p. The Regulations and case law instruct that a plaintiff may be disabled while continuing general life activities and that daily activities such as taking care of oneself and performing household tasks are not considered substantial gainful activity. *See* 20 C.F.R. §404.1573(c); *see also Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (finding error where the ALJ failed to consider the difference between ability to participate in household chores and to walk for two hours at a time and the ability to work in a regular work week); *Clifford*, 227 F.3d at 872 (noting minimal daily activities do not establish that a person is capable of engaging in substantial physical activity). Thus, while the ALJ may consider Plaintiff's ability to perform daily activities in determining his ability to work, it is not by itself determinative. The ALJ, however, did not adequately explain why Pierik's reported performance of certain daily activities trumped the testimony and medical evidence in the record that would suggest his eye impairment limited his ability to do work.

Second, the ALJ concluded that while Pierik experienced significant injury and side effects from his work-related injury, the medical records suggested that Pierik's impairments had improved and stabilized with medications. (R. 26.) The ALJ cited the

---

Pierik's injuries were once severe. In any event, there is no indication that the ALJ's credibility determination relied on the issue of worker's compensation.

following medical evidence as refuting Pierik's allegations: an examination report from Cook County Hospital, in which Pierik reported experiencing an 80% improvement with the use of medications for his vision problems; a progress note dated July 15, 2004 where Pierik reported significant improvement with medication of his skin rash (Grover's disease); and a June 27, 2002 medical report where Dr. Balk reported that Pierik's airway disorder appeared stable with medication and that his pulmonary function test was within normal limits. (R. 26-27.)

Although Pierik did admit that some of his symptoms have been stabilized with medication, the ALJ disregarded Dr. Rheinstrom's report that Pierik is likely to need artificial tears without any improvement in the future, as well as the other evidence and testimony in the record suggesting that the frequent need to use eye drops severely limits Pierik's ability to work. Similarly, although Pierik's rash due to Grover's disease has been treated successfully, the ALJ did not address the testimony of Pierik and his wife that Pierik still has an itchy rash due to chemical exposure.[3] (R. 279-80.) Although the ALJ found that Pierik's airway disorder appears stable with medication, the ALJ may not have fully considered Pierik's testimony that he cannot exercise for more than twenty to thirty minutes due to shortness of breath, as well as the ME's testimony that while the pulmonary function studies show some improvement, they do not "become normal." (R. 300, 277.) Finally, the ALJ appears to have selectively overlooked some symptoms described in the record which have not been stabilized, such as fatigue, difficulty concentrating, and headaches.

---

[3] Notably, the ALJ's report twice refers to Grover's disease as "dry eye," appearing to confuse dry eye syndrome with Grover's disease, which is a skin condition. Thus, it is unclear whether the ALJ confused Pierik's complaints of severe dry eye with the ME's testimony that Grover's disease is relatively benign. (R. 278.)

The ALJ had a duty to fully develop the record and articulate the reasoning behind his ultimate conclusion that Pierik can perform light to medium work. *See Zurawski*, 245 F.3d at 888; *Godbey v. Apfel*, 238 F.3d 803, 807 (7th Cir. 2000). The ALJ, however, did not support by substantial evidence his decisions to disregard favorable medical evidence in the record, to give controlling weight to the opinions of non-treating physicians, to discount the VE's testimony suggesting that Pierik was disabled, and to find Pierik's testimony not credible.

## CONCLUSION

For the foregoing reasons, Pierik's Motion for Summary Judgment or Remand [Doc. No. 24] is granted in part and denied in part; and the Commissioner's Motion for Summary Judgment [Doc. No. 31] is denied. The Court hereby vacates the ruling of the Administrative Law Judge and finds that this matter should be remanded for further proceedings consistent with this opinion.

SO ORDERED.

DATE: AUG 1 4 2007

ENTERED:

HON. MARIA VALDEZ
United States Magistrate Judge

24